UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DANIEL B. TIMMONS,

    Plaintiff,

v.                                             CASE NO: 8:04-cv-1479-T-26MAP

THE PURDUE PHARMA COMPANY, et al.,

    Defendants.
_____/

## O R D E R

Before the Court are Abbott Defendants'[1] Motion for Summary Judgment (Dkt. 235), Plaintiff's Memorandum in Opposition (Dkt. 259), Purdue Defendants'[2] Motion for Summary Judgment (Dkt. S-2), and Plaintiff's Memorandum in Opposition. (Dkt. 261). After careful consideration of the submissions of the parties, the applicable law, and the entire file, the Court concludes that both summary judgments should be granted.

### Background

This diversity action involves Plaintiff Daniel Timmons' claimed addiction to OxyContin, an opioid analgesic approved by the U.S. Food and Drug Administration (FDA) and listed as a Schedule II controlled substance pursuant to the federal Controlled

---

[1] Abbott Defendants are The Abbott Laboratories and Abbott Laboratories, Inc.

[2] The Purdue Defendants include The Purdue Pharma Company, Purdue Pharma L.P., Purdue Pharma, Inc., Purdue Frederick Company, and The P.F. Laboratories, Inc.

Substance Act. Defendants Purdue manufactured OxyContin. Defendants Abbott joined with Purdue to promote and market OxyContin, which is referred to as an "Abbott Medication." Plaintiff sues Purdue and Abbott for product liability based on design defect and negligent failure to adequately warn Plaintiff's physicians of the dangers of OxyContin, breach of express and implied warranties, misrepresentation and fraud, conspiracy against Purdue and Abbott as maker and marketers of OxyContin, and "malicious conduct."[3] Plaintiff seeks damages for the pain and suffering he experienced during his addiction, including the year and a half recovery period, as well as his continued cravings to date.

On July 3, 2002, Plaintiff suffered a back injury on the job in a phosphate mine. Over the following nineteen months, Plaintiff was treated by four different physicians with OxyContin. Dr. Niaz Ausaf, Plaintiff's primary care physician, was the first of four physicians to prescribe OxyContin for Plaintiff's pain. On July 19, 2002, Dr. Ausaf prescribed 10 milligrams of OxyContin to be taken twice per day and permitted him to increase the dosage up to 40 milligrams or more per day as needed for pain.

In August Plaintiff began seeing Dr. Saquib Khan, a pain management specialist. In August 2002, Plaintiff states he informed his doctor that he wished to be taken off OxyContin because Plaintiff feared he was becoming addicted. According to Plaintiff,

---

[3] The Court agrees with Abbott that Florida does not recognize a cause of action for "malicious conduct." To the extent Count VI should be treated as a failure to warn claim, the Court will decide Count VI on that basis.

his doctor persuaded him that he was mistaken about his addiction and that he needed to continue taking OxyContin for his pain.

The workers' compensation carrier then referred Plaintiff to Dr. Delgado, a neurosurgeon, for an evaluation. Dr. Delgado also prescribed OxyContin to relieve the pain in Plaintiff's back. In October 2002, Dr. Delgado prescribed 10 milligrams of OxyContin to be taken twice per day. The doctor increased the dosage in January 2003 to 20 milligrams twice a day. By May 2003, both Plaintiff and his wife requested that he be taken off the drug because he suffered hallucinations, anxiety, depression, memory loss, nervous twitches, decreased sexual desire, and a burning sensation in his skin, making his skin "crawl." Plaintiff then consulted another pain management physician, Dr. William Vargas, a partner of Dr. Khan's.

Dr. Vargas prescribed OxyContin beginning July 19, 2003, with a dosage of 10 milligrams twice per day. On August 15, 2003, Dr. Vargas increased the dosage to 10 milligrams three times per day. On November 17, 2003, the dosage was again increased to 20 milligrams twice a day, and, finally, on January 13, 2004, Dr. Vargas lowered the dosage back to 10 milligrams twice a day. Plaintiff stopped taking all OxyContin in January 2004.

Plaintiff contends that the twelve-hour intervals forced him to experience "mini-withdrawals" because the medicine wore off before the twelve-hour span elapsed. Plaintiff claims that not only did Purdue and Abbott fail to warn his physicians of the special dangers of addictions to OxyContin, but they also affirmatively misrepresented

those dangers. Specifically, Plaintiff claims that Purdue and Abbott misrepresented the rate of addiction and the dangers of prescribing the medication in twelve-hour intervals, and launched a massive sales and marketing campaign designed to encourage physicians to prescribe OxyContin on a long-term basis in patients.

## Defendants' Arguments

Purdue asserts that Plaintiff was not addicted to OxyContin and that all four of his treating physicians were independently aware of the risks of addiction associated with OxyContin. Purdue contends that based on either of these two premises, the learned intermediary doctrine bars Plaintiff's claims. Abbott asserts that as a mere co-promoter, as opposed to Purdue as the developer, designer, or manufacturer, Abbott cannot be liable for any claims other than negligence. With respect to the negligence claim, Abbot posits that it could not have caused any of Plaintiff's injuries in view of the learned intermediary doctrine. Finally, Abbott asserts it cannot be found jointly and severally liable on a "joint venture" theory.

## Disputed Facts Asserted by Plaintiff

Plaintiff asserts that summary judgment cannot be entered because the following material facts are disputed. First, Purdue and Abbott misled Plaintiff's physicians to believe that OxyContin should be prescribed in twelve-hour intervals despite the absence of any medical basis. Plaintiff argues that Purdue was motivated to increase the usage of OxyContin because Purdue had just encountered stiff competition from generic drug manufacturers regarding a cancer pain drug known as MS Contin, which Purdue

manufactured. Even assuming the misrepresentations did not cause Plaintiff's injury, Plaintiff contends that there are disputed issues of fact as to whether OxyContin caused his addiction and the symptoms he suffered and as to whether Purdue's and Abbott's misrepresentations and failure to warn caused him to become addicted.

Plaintiff further asserts that the evidence shows that three of Plaintiff's doctors[4] were misled by Purdue and Abbott with inadequate warnings and misrepresentations which caused Plaintiff's injuries. Plaintiff concedes that Dr. Ausaf testified at deposition that he was aware of all the risks associated with OxyContin. Plaintiff argues that because Dr. Ausaf must have read the package insert in the medication when a sales representative of Purdue first visited him, then he read in the insert that "[i]atrogenic addiction to opioids legitimately used in the management of pain is *very rare*." (Emphasis added).[5] Moreover, Plaintiff contends that Purdue's marketing materials stated that the rate of addiction was "less than 1%."

With respect to Dr. Delgado, Purdue's sales representative Karen White testified that she reviewed the OxyContin Product Data Brochure (PDB) which contained the above-quoted statement about addiction being "very rare." The PDB also stated that "[t]olerance and physical dependence in pain patients are not signs of psychological

---

[4] Plaintiff does not mention his fourth doctor, Dr. Vargas.

[5] This particular provision was later changed to read "[t]he development of addiction to opioid analgesics in properly managed patients with pain has been reported to be rare. However, data are not available to establish the true incidence of addiction in chronic pain patients."

dependence." The PDB further provided that addiction "is characterized by a preoccupation with the procurement, hoarding, and abuse of drugs for non-medicinal purposes," and that "[p]reoccupation with achieving adequate pain relief can be appropriate behavior in a patient with poor pain control." Plaintiff argues that these statements sent a message to physicians that clinical signs of addiction should be disregarded and the usage of OxyContin should not be halted. Plaintiff contends that Dr. Delgado was a "misinformed" intermediary, even though he testified that he did not rely on Purdue's statements in prescribing OxyContin.

Dr. Khan's testimony, as summarized by Plaintiff, evidenced his total acceptance of Purdue's "sales pitch." Plaintiff contends that Dr. Khan acted as an advocate for Purdue in the use of OxyContin, even though Dr. Khan testified that Abbott's marketing had no influence on his decision to prescribe OxyContin to Plaintiff.

**Strict Liability/Negligent Failure to Warn**

A manufacturer, designer, or assembler can be held liable under strict liability. See West v. Kawasaki Motors Mfg. Corp., 595 So.2d 92, 97 (Fla.Dist.Ct.App. 1992). A retailer or seller of the product may also be held liable under strict liability. See Visnoski v. J.C. Penney Co., 477 So.2d 29 (Fla.Dist.Ct.App. 1985). In order to hold Purdue or Abbott, to the extent one considers Abbott a seller,[6] strictly liable in tort, however, the

---

[6] Abbott asserts that it cannot be liable for a failure to warn because it is not the manufacturer of the medication and there is no evidence to support a finding that it played any role in labeling OxyContin. See Upjohn Co. v. MacMurdo, 562 So.2d 680, 683 (Fla. 1990). In any event, the "manufacturer's duty to warn of the drug's dangerous side

user of the product must establish the defect or unreasonably dangerous condition of the product and the proximate causation. See West v. Caterpillar Tractor Co., 336 So.2d 80, 86-87 (Fla. 1976).

*Defect or Unreasonably Dangerous Condition*

A defective product must be proven by expert testimony. See Humphreys v. General Motors Corp., 839 F.Supp. 822, 828-29 (N.D. Fla. 1993), aff'd, 47 F.3d 430 (11th Cir. 1995); see also Worsham v. A.H. Robbins Co., 734 F.2d 676, 687 n. 8 (11th Cir. 1984) (stating that "expert testimony is often required to establish defective design of a product"). Plaintiff's expert, Dr. Stefan P. Kruszewski, opined that Purdue failed to adequately warn physicians about the risks of addiction of OxyContin. He wrote a report in which he stated that "OxyContin has more in common with the addictive nature of a short-acting opioid than a long-acting opioid such as methadone, although it combines some of the most reinforcing and troublesome aspects of tolerance, withdrawal and dependence of both short and long-acting opioids." Another expert, Dr. Richard Uhl, essentially reached the same conclusion. Purdue urges this Court to disregard the testimony of Dr. Kruszewski based on the lack of reliability and qualifications to give an opinion in the area of physical chemistry regarding OxyContin or its ingredients.

---

effects is directed to the physician rather than the patient." Upjohn Co., 562 So.2d at 683, citing Felix v. Hoffmann-LaRoche, Inc., 540 So.2d 102, 104 (Fla. 1989). Consequently, the adequacy of the warning to inform a physician must be proved by expert testimony. Id.

Plaintiff, however, does not make a case for the defectiveness of the chemical composition of OxyContin. Plaintiff claims that the misrepresentations regarding the addictive nature of OxyContin, particularly when used in twelve-hour doses, created an unreasonably dangerous product. To the extent that there may be any genuine issues of material fact in this regard, an analysis of causation renders Plaintiff's case unseaworthy.

*Causal Connection*

Even if OxyContin were considered unreasonably dangerous, which it has not been deemed so, Plaintiff has failed to show any evidence of causation. See Baker v. Danek Medical, Inc., 35 F.Supp. 2d 875 (N.D. Fla. 1996). None of Plaintiffs' four treating physicians testified that Plaintiff was addicted to OxyContin, or that they were unaware of the risks of addiction involved in treating with OxyContin.[7] None relied on Purdue's statements that addiction was very rare or that less than 1% of patients develop an addiction for OxyContin. All of his physicians were treating his severe pain with a drug they knew to be capable of becoming addictive, much like morphine. Even assuming Plaintiff was addicted to OxyContin, the learned intermediary doctrine precludes a finding of causation between Purdue's misrepresentations and/or failure to warn regarding the addictiveness of OxyContin and Plaintiff's addiction.

*Learned Intermediary Doctrine*

---

[7] One non-treating physician, Dr. Miller, opined that based on a review of medical records, Plaintiff's symptoms and number of months on OxyContin indicated Plaintiff was addicted to OxyContin.

The learned intermediary doctrine absolves a manufacturer or retailer from liability associated with a failure to warn.  See Alexander v. Danek Medical, Inc., 37 F.Supp.2d 1346, 1349-50 (M.D. Fla. 1999), aff'd, 202 F.3d 288 (11th Cir. 1999) (table); Savage v. Danek Medical, Inc., 31 F.Supp.2d 980, 983-85 (M.D. Fla. 1999).  Here, as in Alexander and Savage, the Plaintiff cannot show that the inadequacy of the manufacturer's warning affected any of Plaintiff's four doctors' use of the product.

Although Plaintiff contends that the warning in the package insert stating that addiction was "rare" and the statement in the marketing materials that the addiction rate for OxyContin was less than 1%, essentially amount to a *prima facie* showing that the warning was inadequate for his four physicians, all four physicians testified that they were independently aware of the risks of addiction to OxyContin.  Perhaps, most important, his treating physicians never testified that Plaintiff was addicted to OxyContin.  None of them purport to say that had the written warnings and promotional materials contained different rates of addiction, it would have made a difference in their selection of OxyContin.  In sum, there is no evidence in the record to suggest that any of Plaintiff's four physicians were deceived by Purdue's or Abbott's marketing.

## Fraud and Misrepresentation

No one from Abbott ever had any communication with Plaintiff and therefore no misrepresentation or omission on the part of Abbott can be claimed by Plaintiff.  Furthermore, because Abbott played no part in the package insert in OxyContin, Abbott was not capable of misrepresenting or making omissions regarding the medication.

Plaintiff cannot establish reliance, an essential element of fraud and misrepresentation, on any of the promises, misstatements or omissions made by Purdue or Abbott. His physicians testified that they would have prescribed OxyContin to him despite any misstatement regarding the rate of addiction.

### Breach of Warranty

In Florida, to recover for breach of either express or implied warranties, the plaintiff must be in privity of contract with the defendant. See T.W.M. v. Am. Med. Sys., Inc., 886 F.Supp. 842, 844 (N.D. Fla. 1995) (holding that plaintiff who does not buy product directly from defendant is not in privity with that defendant, citing Kramer v. Piper Aircraft Corp., 520 So.2d 37, 38 (Fla. 1988) (holding that strict liability in tort supplants breach of implied warranty where no privity of contract exists). There is no evidence to suggest that any privity exists between either Abbott and Plaintiff or Purdue and Plaintiff; therefore, neither Abbott nor Purdue can be found liable for breach of implied or express warranties based on the lack of privity with Plaintiff.[8]

### Joint Venture Theory of Liability Against Abbott

This Court need not decide the magnitude of Abbott's involvement with the alleged misrepresentations made in the promotion of OxyContin or the precise

---

[8] As with breach of warranty, Plaintiff's civil conspiracy claim must fail. Plaintiff cannot establish an underlying tort as the basis of any conspiracy.

relationship between Abbott and Purdue.[9]  The Court finds that even if Abbott were in a joint venture with Purdue, Abbott is not liable based on the findings set forth above.

Purdue and Abbott have met their respective burdens of establishing an absence of genuine issues of material fact and Plaintiff has not come forward with facts showing that a genuine issue exists for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).   Summary judgment is therefore entered in favor of Purdue and Abbott on all of Plaintiff's claims.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1) Abbott Defendants' Motion for Summary Judgment (Dkt. 235) is **GRANTED**.  The Clerk is directed to enter final summary judgment in favor of Abbott Defendants on all claims.

(2) Purdue Defendants' Motion for Summary Judgment (Dkt. S-2) is **GRANTED**.  The Clerk is directed to enter final summary judgment in favor of Purdue Defendants on all claims.

(3) The Clerk is directed to close this case.

**DONE AND ORDERED** at Tampa, Florida, on February 2, 2006.

---

[9] In any event, Abbott never called on two of Plaintiff's four physicians, Drs. Ausaf and Vargas.  Abbott did not call on Dr. Delgado until after he had prescribed OxyContin to Plaintiff.  Although a representative of Abbott visited Dr. Khan before he prescribed OxyContin to Plaintiff, Dr. Khan testified that his decision to prescribe OxyContin had nothing to do with Abbott's marketing of the drug.  Plaintiff has provided no evidence to the contrary.

                              s/
                      **RICHARD A. LAZZARA**
                **UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record